**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | No. 1:15-cr-00159 |
| v. : | |
| : | (Judge Kane) |
| : | |
| FLOYD A. BENKO, : | |
|       Defendant : | |

**MEMORANDUM**

Before the Court is Defendant's motion to dismiss the indictment. (Doc. No. 21.) The motion has been fully briefed and is ripe for disposition. For the reasons that follow, the Court will deny Defendant's motion.

**I.  BACKGROUND**

On July 29, 2015, a federal grand jury returned a three-count indictment charging Defendant with one count of health care fraud in violation of 18 U.S.C. § 1347(a)(1) at Count I of the indictment, and two counts of making false statements in health care matters in violation of 18 U.S.C. § 1035, at Counts II and III. (See Doc. No. 1.) The grand jury alleges that Defendant Floyd Benko failed to properly conduct medical diagnostic tests while employed at Hershey Medical Center (HMC), and that Benko made false statements to HMC during its investigation of Benko's malfeasance. (See id.) Defendant filed this motion to dismiss the indictment on December 7, 2015 (Doc. No. 21). Jury selection in this case is scheduled to commence on April 11, 2016. (Doc. No. 19.)

The indictment spans approximately 18 months, from April 9, 2013, through November 10, 2014. (Id. ¶ 6.) The grand jury alleges that Defendant was employed as a "Research

1

Technologist" at HMC.¹ (Doc. No. 1 ¶ 3.) Defendant had more than twenty years of experience with HMC, and the indictment credits him with having "extensive pathology laboratory experience." (Id.) HMC enlisted Defendant to assist in drafting Standard Operating Procedures (SOPs) for "Epidermal Growth Factor Receptor (EGFR), KRAS gene mutation (KRAS), and BRAF gene mutation (BRAF) assays." (Id. ¶¶ 2-4.) These assays are tests used to assist physicians in diagnosing and effectively treating patients with cancer. (Id. ¶ 2.) According to the indictment, the SOPs that were eventually adopted for these tests "called for the use of a device known as a NanoDrop 2000 spectrophotometer" to examine DNA from patient tissue samples.² (Id. ¶ 4.) The SOPs also mandated that any patient tissue samples remaining after the tests were to be preserved. (Id.) Benko was dismissed from his employment sometime between April and October 2014. (Id. ¶¶ 10-11.)

During the time in question, Defendant performed these tests for 124 HMC cancer patients. (Id. ¶ 6.) He performed these tests alone in HMC's "Molecular Diagnostics laboratory." (Id.) The indictment alleges that Defendant never used the NanoDrop 2000 for the assays and did not preserve patient tissue samples, all in derogation from the SOPs – SOPs that he himself had assisted in drafting. (Id. ¶¶ 5-7.) In addition, Defendant allegedly concealed or failed to disclose these derogations to the HMC physician that supervised the lab tests. (Id. ¶ 7.)

In late 2013, a treating physician observed that a patient's HMC test results were at odds with the patient's clinical profile. (Id. ¶ 8.) Defendant had performed the particular test in question. (Id.) The treating physician ordered the same test from an outside laboratory, which

---

[1] These background facts are drawn directly from the indictment, accepted as true only for the limited purpose of this motion.

[2] Defendant has attached the SOPs to his motion to dismiss (Doc. Nos. 21-1, 21-2, 21-3), and argues that the SOPs do not require the use of the NanoDrop 2000 in "paraffin tissue assays" such as those at issue in the indictment (Doc. No. 22 at 6). The Court addresses this argument below.

reached a different result than the results reached by Defendant on the same patient's tissue. (Id.)  The treating physician alerted Defendant's supervising physician to the discordant results. (Id.)  Defendant's supervisor instructed Defendant to repeat that patient's test, and again Defendant reached a result different than that of the outside laboratory.  (Id. ¶ 9.)  After this second discordant result, Defendant's supervising physician sought out the tissue samples from the patient that would have been properly preserved under the SOPs.  (Id.)  The supervisor was unable to find the tissue samples or the tissue samples for any of the 124 patients whose tests Defendant had conducted.  (Id.)  The supervising physician confronted Defendant, who allegedly "had no explanation for the missing DNA and tissue slides at that time."  (Id.)  Ultimately, HMC paid an outside laboratory to re-test the 124 patients whose tests Defendant had originally performed, and reimbursed the affected patients' insurers for tests conducted by Defendant, resulting in a loss of $102,406 to HMC.  (Id. ¶ 12.)  The outside laboratory's results were "discordant" with Defendant's original results for 60 out of 124 patients.  (Id.)

Defendant allegedly sent two written communications to HMC regarding the tests that he performed.  The indictment alleges that Defendant first sent a five-page, handwritten statement on April 11, 2014, shortly after his supervising physician became aware of the discordant test results.  (Id. ¶ 10.)  In it, Defendant allegedly invented an excuse – later admitted to be false – about why the tissue samples had not been preserved.  (Id.)  This first letter made no mention of the NanoDrop 2000.  (See id.)

Defendant sent the second letter on October 2, 2014, after his employment had been terminated.  (Id. ¶ 11.)  In the October letter, Defendant admitted to fabricating the excuses he provided in the first letter regarding the preservation of patient tissue samples.  (Id.)  However, even in the October letter, Defendant "insisted [that] he otherwise performed the assays in

3

conformance with HMC's standard operating procedures." (Id.) Once again, the October letter made no mention of the NanoDrop 2000 spectrophotometer. (Id.)

On July 29, 2015, a federal grand jury returned a three-count indictment. (Id.) In Count I, the indictment charges Defendant with health care fraud in violation of 18 U.S.C. § 1347. (Id. at 5-6.) According to the indictment, Defendant defrauded HMC in connection with the delivery of healthcare services by: failing to use the NanoDrop 2000 spectrophotometer in conducting the assays, failing to preserve the leftover patient tissue samples, failing to disclose his actions to his supervising physician or HMC management, and by providing false statements about the manner in which he performed the tests. (Id.) Counts II and III charge Defendant with making false statements to HMC. (Id. at 7-8.) Counts II and III are predicated on the letters Defendant wrote to HMC in April and October of 2014. (See id.) Defendant filed this motion to dismiss the indictment on December 7, 2015, arguing that the indictment fails to make out the elements for the crimes charged. (See Doc. No. 21.) The motion has been fully briefed.

## II. LEGAL STANDARD

Federal Rule of Criminal Procedure 12(b)(3) permits a criminal defendant to move pre-trial to dismiss an indictment under which he or she has been charged. Fed. R. Crim. P. 12(b)(3)(B). A motion to dismiss the indictment "is not . . . 'a permissible vehicle for addressing the sufficiency of the government's evidence.'" United States v. Bergrin, 650 F.3d 257, 265 (3d Cir. 2011) (quoting United States v. DeLaurentis, 230 F.3d 659, 660-61 (3d Cir. 2000)). Instead, a district court asks "whether the facts alleged in the indictment, if accepted as entirely true, state the elements of an offense and could result in a guilty verdict." Id. at 268. "Generally speaking, it is a narrow, limited analysis geared only towards ensuring that legally deficient charges do not go to a jury." Id. To sufficiently state a claim, an indictment "must be a plain, concise, and

definite written statement of the essential facts constituting the offense charged and must be signed by an attorney for the government." Fed. R. Crim. P. 7(c)(1). "For each count, the indictment or information must give the official or customary citation of the statute, rule, regulation, or other provision of law that the defendant is alleged to have violated." Id. Generally, an indictment is "deemed sufficient if it: (1) contains the elements of the offense intended to be charged, (2) sufficiently apprises the defendant of what he must be prepared to meet, and (3) allows the defendant to show with accuracy to what extent he may plead a former acquittal or conviction in the event of a subsequent prosecution." United States v. Vitillo, 490 F.3d 314, 321 (3d Cir. 2007) (quoting United States v. Rankin, 870 F.2d 109, 112 (3d Cir. 1989)).

## III.  DISCUSSION

Defendant argues that the indictment fails to allege conduct that constitutes the crimes charged. The Court begins by comparing the language of the pertinent criminal statutes with the indictment's factual allegations. The Court then turns to Defendant's particular arguments.

### A.  Statutory language

#### 1.  Health care fraud

The federal health care fraud statute, 18 U.S.C. § 1347, prohibits (1) "knowingly and willfully execut[ing], or attempt[ing] to execute;" (2) "a scheme or artifice . . . to defraud;" (3) "any health care benefit program;"[3] (4) "in connection with the delivery of or payment for health care benefits, items, or services[.]" 18 U.S.C. § 1347. A 2010 revision to the statute effected by the Patient Protection and Affordable Care Act, clarifies that "a person need not have actual knowledge of this section or specific intent to commit a violation of this section" in order to be

---

[3] The indictment charges that HMC is a "health care benefit program" under the statute, and Defendant does not contest this allegation. (See Doc. Nos. 1 ¶ 1; 22.)

5

guilty of health care fraud. Id.; see also "Patient Protection and Affordable Care Act," Pub. L. No. 111-148, § 10606(b), 124 Stat. 119, 1008 (2010).

In addition to incorporating the factual allegations of the indictment, Count I charges that between April 9, 2013, and November 10, 2014, Defendant "did knowingly and willfully execute, and attempt to execute, a scheme and artifice to defraud any health care benefit program in connection with the delivery of and payment for health care benefits, items, and services[.]" (Doc. No. 1 ¶ 5.) The indictment alleges that Defendant violated the statute by: (i) failing to use the NanoDrop 2000 spectrophotometer in conducting the EGFR, KRAS, and BRAF tests, in derogation from HMC's SOPs; (ii) failing to preserve patient tissue samples after conducting the tests, also in derogation from HMC's SOPs; (iii) "failing to disclose and concealing those facts from HMC's management," and (iv) providing false statements about how Defendant performed the tests to HMC's management. (Id. at 6.)

Reading Section 1347's text against the indictment's allegations, the Court concludes that the Grand Jury has alleged facts that if proven would constitute health care fraud. The indictment tracks the "knowingly and willfully" standard from the statute, and the indictment provides sufficient factual support for the notion that Defendant knew he was required to use the NanoDrop 2000 spectrophotometer in conducting the assays – especially given that he assisted in drafting the SOPs – and failed to do so. In addition, the indictment charges that Defendant concealed his non-use of the spectrophotometer from his supervising physician, introducing the element of deceit. Considered as a whole, the allegations are sufficient to allege knowing and willful conduct and satisfy the element of an intent to defraud. In addition, the allegation that Defendant repeated this behavior over scores of tests, together with the other allegations in the indictment, satisfies the Government's burden of pleading a "scheme or artifice" to defraud.

Finally, the statute's plain text encompasses acts made "in connection with the delivery of or payment for" health care items or services. As such, the indictment's allegations that Defendant was engaged in diagnostic testing in a clinical laboratory setting satisfy the Government's pleading burden on the "in connection with" requirement from the statute, because diagnostic testing constitutes health care items or services. From a plain reading of the indictment and Section 1347, the Court finds that the Government has sufficiently stated the offense of health care fraud. See Vitillo, 490 F.3d at 321.

### 2. False statements relating to health care matters

A separate federal statute criminalizes the making of materially false statements in health care matters. In particular, 18 U.S.C. § 1035 makes it a crime to (1) "knowingly and willfully;" (2) conceal or cover up a material fact or make a materially false or fraudulent statement; (3) "in connection with the delivery of or payment for health care benefits, items, or services[.]" 18 U.S.C. § 1035(a).[4] To fall within the statute's ambit, such material misstatement must be made "in any matter involving a health care benefit program." Id.

In Counts II and III, the indictment charges that Defendant sent two written communications to HMC in the wake of his failure to properly perform the assays. Count II

---

[4] The full text of 18 U.S.C. § 1035(a) reads:

"(a) Whoever, in any matter involving a health care benefit program, knowingly and willfully—

  (1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact; or

  (2) makes any materially false, fictitious, or fraudulent statements or representations, or makes or uses any materially false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry,

in connection with the delivery of or payment for health care benefits, items, or services, shall be fined under this title or imprisoned not more than 5 years, or both."

concerns the April 2014 note that Defendant provided to HMC. In particular, the indictment alleges that on April 11, 2014, Defendant provided HMC with "a handwritten statement in which he" (i) "lied about the manner by which he performed the assays;" (ii) "provided a false explanation as to why there were no leftover patient tissue" samples; and (iii) "concealed and covered up" his failure to use the NanoDrop 2000 spectrophotometer in performing the tests. (Doc. No. 1 at 7.) An earlier section of the indictment alleges that Defendant falsely claimed that no patient tissue had been preserved because Defendant had "concentrat[ed] the patients' DNA with reduced elution volumes," thereby leaving "little or no DNA to preserve." (Id. ¶ 10.) The indictment alleges that Defendant's October 2, 2014 letter to HMC confirms that Defendant fabricated this explanation. Count III concerns the October 2, 2014 letter; specifically, the indictment alleges that on October 2, 2014, Defendant provided HMC "a letter in which Benko falsely claimed he followed all of HMC's standard operating procedures in performing EGFR, KRAS, and BRAF assays for 124 patients[.]" (Id. at 8.) In addition, the indictment alleges that Defendant "concealed and covered up the fact that he did not use a NanoDrop 2000 spectrophotometer in conducting the assays as required by standard HMC operating procedures." (Id. at 8-9.) According to an earlier section of the indictment, the October 2, 2014 letter intimated that Defendant had not concentrated patient DNA with reduced elution volumes, conceding that his April 11 letter contained a false explanation. (Id. ¶ 11.) Instead, Defendant stated in the October 2 letter that he had simply failed to preserve the patient tissues, but that he had "otherwise performed the assays in conformance with HMC's standard operating procedures." (Id.)

     Comparing the indictment's allegations with the language of Section 1035, the Court again concludes that the indictment contains all of the elements necessary for the crime of

making false statements related to health care matters.  Counts II and III both track the language of Section 1035 regarding Defendant's state of mind – knowingly or willfully.  As to Count II, the indictment charges that the April 11, 2014 correspondence misrepresented Defendant's reasons for ignoring the requirement that he preserve patient tissue samples and concealed Defendant's non-compliance with HMC procedures.  As to Count III, the indictment charges that the October 2, 2014 correspondence once again concealed that Defendant had not used the NanoDrop 2000 spectrophotometer when performing the assays. These misrepresentations are sufficient to meet the Government's pleading burden.

The Court finds that the Government has properly charged as to all three counts, and consequently, the Court will deny Defendant's motion to dismiss the indictment.  However, because a number of Defendant's arguments merit discussion, the Court addresses each of them below.

### B. Defendant's arguments

Defendant raises four primary arguments in support of his motion.  First, Defendant argues that the indictment fails to state an offense because it does not allege that Defendant personally profited or intended to profit from the tests. (Doc. No. 22 at 2-4.)  Second, Defendant argues that the indictment fails to state an offense because it does not allege that Defendant's conduct impacted billing or payment for medical services.  (Id.)  Third, Defendant argues that the mere failure to comply with standard operating procedures does not constitute a criminal offense. (Id. at 5-6.)  Fourth and finally, Defendant characterizes the indictment as charging him with "honest services" fraud, and Defendant argues that "honest services" fraud is only cognizable under the Anti-Kickback Statute, and not the statutes under which Defendant has been charged. (Id. at 7.)  The Court addresses each in turn.

1.      **No personal profit motive**

First, Defendant correctly points out that the indictment fails to allege that he personally profited or intended to profit from his alleged activities, as such, Defendant argues that the indictment fails to state a health care fraud offense. (Doc. No. 22 at 2-4.) Defendant offers no authority for the proposition that an element of the offense charged here is financial gain or personal profit. Rather, Defendant cites several health care fraud cases from the Third Circuit and argues that "in every single case of a sustained [health care fraud] conviction, one or more defendants either profited directly from the fraud, engaged in a conspiracy in which one o[r] more persons profited from the fraud and/or the fraud always related to the payment or billing for medical services[.]" (Doc. No. 22 at 2-3) (collecting cases, citing United States v. Kolodesh, 787 F.3d 224, 230 (3d Cir 2015)).

Defendant extrapolates from these cases that one cannot have "the intent to defraud" for purposes of 18 U.S.C. § 1347 without a commensurate intent to enrich oneself by means of the fraud. (See id.) Although there is logic to Defendant's argument, because in common parlance fraud is understood to encompass loss to one person and gain to another, there is no legal support for Defendant's position.

In determining whether the Government has proven fraud, injury or loss must be proved, and pecuniary gain to the Defendant is probative of that issue.[5] However, gain or profit to Defendant is not an element of the statute that must be alleged and proven. As discussed in an earlier section, the indictment contains sufficient factual allegations to charge that Defendant knowingly deviated from the SOPs for the tests that he conducted. Indeed, the indictment

---

[5] In addition, the Third Circuit model jury instructions explicitly permit a jury to consider whether or not the defendant acted with the intent of securing pecuniary gain for himself in determining whether the defendant acted with "the intent to defraud." Mod. Crim. Jury Instr. 3rd Cir. 6.18.1347-1.

10

charges that Defendant assisted in drafting the rules he is charged with flouting.  However, the indictment does not allege or hypothesize as to Defendant's broader motive for departing from accepted procedures and concealing that departure from his employer.  At this juncture, the Court can only speculate as to what motivated the conduct alleged here.  Financial gain, incompetence, tomfoolery, or ill will may have set in motion the conduct charged in the indictment.  To conclude that only one of these potential motives – financial gain – is adequate to satisfy the elements of the statute would require the Court to rewrite the statute to include an element not found there.

    Not unlike other statutory schemes (e.g., mail fraud, securities fraud), in 18 U.S.C. § 1347, Congress has effected a statute that preserves the integrity of a societal institution, here the health care system, by penalizing those who would impede or co-opt that institution through fraud or deceit.  See McNally v. United States, 483 U.S. 350, 365 (1987) ("Congress sought to protect the integrity of the United States mails by not allowing them to be used as instruments of crime."), superseded on other grounds by 18 U.S.C. §1346, as recognized by Skilling v. United States, 561 U.S. 358, 402 (2010).  The breadth of the statute includes those who would undermine the integrity of the system for personal financial gain or for some other reason not so readily apparent.  At trial on this matter, the Government may offer evidence of financial gain, but it need not.

    So long as the indictment as written states an offense, as the Court has held above that this indictment succeeds in doing, the indictment is sufficient.  See United States v. Panarella, 277 F.3d 678, 684-85 (3d Cir. 2002) abrogated on other grounds by Skilling v. United States, 561 U.S. 358, 408-409 (2010).  And while Defendant Benko's collected cases may be distinguished from Defendant's case because the other defendants intended to enrich themselves,

that distinction leads the Court to conclude that the present case is atypical, not that the present indictment is defective. The Court cannot write an additional requirement into 18 U.S.C. § 1347 merely because prior cases have fit within a pattern that the present case may not. Accordingly, the Court rejects Defendant's argument and will deny his motion.

### 2. No connection to billing or payment

Next, Defendant argues that because the use of the NanoDrop 2000 was not "specifically billed for" and " not a prerequisite for billing under any of the payment requests or billing codes," the indictment fails to allege that his actions were taken in connection with the delivery of or payment for health care items or services. (Doc. No. 22 at 4.) Defendant offers no case support for this proposition.

Defendant's position ignores the plain language of 18 U.S.C. § 1347, which explicitly provides that a defendant commits health care fraud when he or she knowingly or willfully executes a scheme or artifice to defraud a health care benefit program "in connection with the delivery of or payment for health care benefits, items, or services[.]" 18 U.S.C. § 1347 (emphasis added). In general, "[c]ourts construe statutory language to avoid interpretations that would render any phrase superfluous." United States v. Jones, 471 F.3d 478, 482 (3d Cir. 2006) (quotations omitted). Were the Court to adopt Defendant's position that all health care fraud prosecutions must involve billing or payment, the statute's prohibition on fraud in the "delivery of" health care services would become superfluous. Accordingly, the Court rejects Defendant's argument and will deny his motion.

### 3. Mere failure to comply with SOPs

Third, Defendant argues that "a violation of . . . medical practices and standards does not constitute a crime," so the indictment fails to state an offense against him.[6] (Doc. No. 22 at 5-6.) According to Defendant, the Third Circuit held in United States v. Gomez, 237 F.3d 238 (3d Cir. 2000), that "an employee's failure to adhere to accepted medical standards is not relevant to the issue of fraud under 18 U.S.C. § 1347." (Doc. No. 22 at 5.) The Government argues that, to the extent Gomez concerns the relevance of accepted medical practices, Defendant has overstated its holding. (Doc. No. 23 at 10-11.)

The Court agrees with the Government that the cases Defendant cites in support of his position are largely inapplicable. For example, in Gomez, a panel of the Third Circuit listed the four issues that the defendant raised on appeal, two of which concerned accepted medical practices, and two of which concerned the Fifth Amendment. 237 F.3d at 239. The panel's opinion addressed only the Fifth Amendment issues, ignoring the medical standards issues except to reject them summarily. See id. at 239-241. Defendant also invokes United States v. Delgado, 668 F.3d 219 (5th Cir. 2012) in support of his position. (Doc. No. 22 at 5.) In Delgado, the Fifth Circuit approved the use of a limiting instruction to accompany evidence of the Delgado defendant's violation of accepted medical practices. 668 F.3d at 227. The instruction cautioned that "any potential violations of" Medicare or Medicaid rules or

---

[6] Defendant also argues that HMC's standard procedures for the relevant tests did not require the use of the NanoDrop 2000 when using paraffin tissue assays instead of other tissue samples. (See Doc. No. 22 at 6.) Defendant attaches copies of certain SOPs to his motion to dismiss. (Doc. Nos. 22-1; 22-2; 22-3.) Even accepting the proffered documents as submitted, upon review, the Court cannot find that the SOPs do not mandate the use of the NanoDrop 2000 spectrophotometer. (E.g., Doc. No. 22-1 at 8) ("3. Take processed DNAs to Molecular Diagnostics Laboratory Biological Safety Cabinet (BSC) to quantitate specimens on the NanoDrop 2000 spectrophotometer."). Regardless, Defendant's compliance with the SOPs is a question of fact not susceptible to determination on a motion to dismiss the indictment, because the indictment specifically alleges that Defendant violated the SOPs. On a Rule 12 motion, the Court must accept all well pleaded facts as true. See United State v. Bergrin, 650 F.3d 257, 270 (3d Cir. 2011).

13

regulations, "are not sufficient in and of themselves to prove the charges alleged in the indictment." Id.

Defendant's argument is unavailing. While it may be so that a violation of medical practices is not itself health care fraud, there is no support for the proposition that the facts that establish a violation of standard practices cannot also form the basis for a health care fraud indictment. As the Court held above, the allegations in the indictment are sufficient to state a health care fraud offense. Additionally, the Court observes that Defendant is not charged with merely failing to comply with procedures; he is charged with knowingly or willfully failing to properly perform diagnostic testing on scores of HMC patients and with concealing his deviations from his employer, a qualifying health care organization. Accordingly, the Court rejects Defendant's argument and will deny his motion.

### 4. Honest services fraud

Finally, Defendant argues that the indictment alleges "honest services" fraud, and that following Skilling v. United States, 561 U.S. 358, 408-409 (2010), theories of honest services fraud are not permitted to establish health care fraud. (Doc. No. 22 at 7-8.)

Honest services fraud occurs when an offender uses his or her position with an organization or government to secure benefits from a third party. Skilling, 561 U.S. at 400. Such fraud need not result in any loss to the defrauded entity. Id. "For example, if a city mayor (the offender) accept[s] a bribe from a third party in exchange for awarding that party a city contract, yet the contract terms [are] the same as any that could have been negotiated at arm's length, the city (the betrayed party) [suffers] no tangible loss." Id. In such situations, the offender is said to deprive the government or organization that employs him or her of the

employee's "honest services." See id. The Supreme Court's Skilling opinion held that honest services fraud was a viable theory only for bribery and for kickbacks. See id.

While HMC employed Defendant, and while under the indictment's facts, Defendant may well have deprived HMC of his "honest services," Skilling does not bar the present prosecution. The Government has not charged Defendant with honest services fraud; the Government has indicted Defendant for health care fraud and making false statements in connection with health care. (See Doc. No. 1.) The indictment specifically alleges that Defendant knowingly and willfully caused monetary losses to HMC well beyond the loss of any intangible rights, such as honest services. See United States v. Wright, 665 F.3d 560, 568-578 (3d Cir. 2012) (vacating convictions following Skilling for counts involving "defraud[ing] Philadelphia's citizens of [the defendant's] honest services," but leaving undisturbed convictions for "traditional fraud," where a victim suffered monetary loss). There is no support in law for the notion that activity criminalized by multiple criminal statutes becomes legal when any one of those statutes is repealed or struck down.

The Government has not charged Defendant with depriving HMC of his honest services. Any implication that Defendant may have incidentally deprived HMC of his honest services does not serve to undermine the indictment's viability.[7] The Court has found above that the conduct alleged in the indictment is sufficient to state the offenses charged against him. Accordingly, the Court rejects Defendant's argument and will deny his motion.

## IV. CONCLUSION

Defendant argues that his "alleged employee misfeasance does not constitute criminal conduct." (Doc. No. 22 at 7.) "Otherwise," Defendant continues, "every employer-employee

---

[7] Defendant does not argue, as the Skilling defendant did, that the statute under which he has been indicted is unconstitutionally vague. (See Doc. No. 22); Skilling, 561 U.S. at 399-403 ("The honest-services statute, § 1346, Skilling maintains, is unconstitutionally vague.")

15

dispute would come under the jurisdiction of the federal criminal health care fraud statute." (Id.) While the facts now known appear to make for an unusual application of the federal health care fraud statute, the Court cannot find that the Governments has failed to properly allege a violation of the law. For the foregoing reasons, Defendant's motion to dismiss the indictment will be denied. An order consistent with this memorandum follows.